UNITED STATES of America,
Plaintiff–Appellee,

v.

Alejandro MONTEZ, Jr., Defendant–Appellant.

No. 91–5504.

United States Court of Appeals,
Fifth Circuit.

Jan. 21, 1992.

---

John R. Carter, Asst. Federal Public Defender, Lucien B. Campbell, Federal Public Defender, San Antonio, Tex., for defendant-appellant.

LeRoy Morgan Jahn, Asst. U.S. Atty., Ronald F. Ederer, U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before REYNALDO G. GARZA and GARWOOD, Circuit Judges, and SCOTT, District Judge.*

REYNALDO G. GARZA, Circuit Judge:

This is an appeal from a revocation of supervised release and a term of further imprisonment imposed upon Alex Montez,

---

* District Judge of the Western District of Louisi-

Jr. ("Montez"), who was found to have violated the terms of his release by possessing cocaine. Montez claims that the cocaine, found by agents of the United States Bureau of Alcohol, Tobacco and Firearms ("ATF"), should have been suppressed at his revocation hearing. Moreover, Montez claims that even if the cocaine were properly admitted, there was insufficient evidence that he knowingly possessed it. Finally, Montez contends that the district court committed reversible error by failing to consider the Chapter Seven policy statements of the U.S. Sentencing Guidelines in revoking his supervised release.

We AFFIRM the district court in all respects.

## PROCEDURAL HISTORY

In January, 1988, a federal grand jury returned a superseding indictment charging Montez with conspiring to possess (count 1), and possessing (count 2), cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and using a communication device to facilitate the commission of a drug felony in violation of 21 U.S.C. § 843(b) (count 3). Pursuant to a plea agreement, Montez pleaded guilty to the conspiracy charge in exchange for the promise of the United States to dismiss the remaining counts of the indictment at sentencing. Montez was sentenced under the Sentencing Guidelines in July, 1988, to 16 months imprisonment to be followed by three years of supervised release, fined $7,500.00 and assessed $50.00 for the Crime Victims Fund. Montez served his term of imprisonment and was released.

In August, 1990, after a search of Montez's vehicle resulted in the seizure of a small quantity of cocaine, the district court issued an arrest warrant for Montez which was executed on August 28, 1990. A preliminary hearing pursuant to Federal Rule of Criminal Procedure 32.1 and a bond hearing were held on September 4, 1990. The magistrate found probable cause and denied bond. The government filed a mo-

ana, sitting by designation.

tion for revocation of supervised release on September 6, 1990. Originally the government had filed criminal charges against Montez, but these were dropped on the government's own motion.

Prior to the revocation hearing, held November 9, 1990, Montez filed a motion to suppress the cocaine found in the search of his vehicle, challenging the scope of the search conducted pursuant to a federal search warrant. At the conclusion of the hearing, the district court denied Montez's motion to suppress and revoked Montez's supervised release, sentencing him to an additional term of imprisonment of two years. Montez did not appeal in timely fashion, but the district court entered an order finding excusable neglect and extending time for doing so.

## FACTS

On August 17, 1990, Special Agent Robert Rowe, a fourteen year veteran of ATF, obtained a federal search warrant for Montez's pickup truck. The search warrant was based on information received by Rowe from an agent of the Drug Enforcement Administration ("DEA"), who in turn had obtained it from a confidential informant. The informant had told the DEA agent that Montez always carried a gun under the seat of his truck and that said informant had seen it there on several occasions. Moreover, the informant stated that Montez was dealing in narcotics and had the gun for protection. The informant also told the agent that Montez worked at a particular garage in San Antonio, and described Montez's truck and the gun.

After conducting his own investigation to confirm the ownership of the truck, Rowe obtained a warrant to search a "1984 Chevrolet pick-up truck, gold over tan in color, bearing Texas License Plate No. 608 8EP." It also designated the property to be sought and, if found, seized, as "a semiautomatic handgun, dark in color, with brown grips." ATF agents executed the warrant on August 18, 1990. They located the empty vehicle at Montez's place of employment at approximately 5:30 p.m. that Saturday evening and kept it under surveil-

lance until approximately 11:50 that night. No one approached the truck during that time.

At approximately 10:00 p.m., after the outside lights of the garage/service station had been extinguished, the agents observed approximately ten late model luxury vehicles arrive at the garage. The occupants got out of the vehicles, went into the station, and quickly returned to their vehicles without making any obvious purchases of goods or services.

At approximately 11:50 p.m., four men, including Montez, left the station. Montez approached the truck, got in and drove off. The ATF agents stopped him about five minutes later and searched his truck. The search yielded neither a gun nor ammunition. The agents did, however, find a small folded piece of paper in a map pocket on the driver's side of the vehicle. The paper was too small to contain a gun or even a bullet, and had no markings on the outside. Nevertheless, the ATF agent unfolded the paper and found that it contained white powder, which field tested positive for cocaine. At the bottom of this pouch, in which the agents found the cocaine, was a small tool which Montez had to use to start the truck, the ignition of which was broken.

## ANALYSIS

The parties dispute whether or not the cocaine was properly seized. Our holding that the exclusionary rule does not apply in supervised release revocation hearings absent a showing of harassment renders this issue irrelevant. Moreover, our holding on this issue leads us to conclude that the district court's finding of Montez's knowing possession of a controlled substance was not clearly erroneous. Finally, we find that Montez's contention that the district court failed to consult the policy statements in the Sentencing Guidelines has been waived.

I. *The Exclusionary Rule does not Apply to Revocation of Supervised Release Hearings.*

■ Montez contends that the search and seizure of the packet containing the

cocaine exceeded the scope of the warrant, which only authorized seizure of a firearm. *See United States v. Espinoza*, 826 F.2d 317 (5th Cir.1987) (officers with a warrant to seize only narcotics properly seized guns which were in "plain view"). We find this issue irrelevant because we hold that the exclusionary rule, absent a showing of harassment, does not apply to revocation of supervised release hearings.

According to the Fourth Amendment of the United States Constitution, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, ..." Under the judicially created exclusionary rule, "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of [an] illegal search and seizure." *United States v. Calandra*, 414 U.S. 338, 347, 94 S.Ct. 613, 619, 38 L.Ed.2d 561 (1974) (witness summoned to testify before a grand jury may not refuse to testify on the ground that the questions he must answer are based on evidence obtained in violation of the Fourth Amendment) (citations omitted). The Supreme Court has made clear, however, that the exclusionary rule is meant to protect society, not the rights of the damaged individual:

> The primary justification for the exclusionary rule ... is the deterrence of police conduct that violates Fourth Amendment rights. *Post–Mapp* [*v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)] decisions have established that the rule is not a personal constitutional right. It is not calculated to redress the injury to the privacy of the victim of the search or seizure, ...

*Stone v. Powell*, 428 U.S. 465, 486, 96 S.Ct. 3037, 3048, 49 L.Ed.2d 1067 (1976). In other words,

> [t]he rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way— by removing the incentive to disregard it.

*Calandra*, 414 U.S. at 347, 94 S.Ct. at 620 (quoting *Elkins v. United States*, 364 U.S.

206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960)).

Montez, while admitting at oral argument that the courts have never applied the exclusionary rule at sentencing hearings, would nevertheless have us extend the rule to cover revocation of supervised release hearings. Before doing so,

> we must weigh the benefits to be derived from this proposed extension of the exclusionary rule [against the potential damage]. Suppression of the use of illegally seized evidence against the search victim in a criminal trial is thought to be an important method of effectuating the Fourth Amendment. But it does not follow that the Fourth Amendment requires adoption of every proposal that might deter [official] misconduct.

*Calandra*, 414 U.S. at 350, 94 S.Ct. at 621.

This Court has previously held "that the exclusionary rule does not apply to probation revocation hearings absent police harassment of probationers." *United States v. Wiygul*, 578 F.2d 577, 578 (5th Cir.1978) (per curiam) (*citing United States v. Brown*, 488 F.2d 94, 95 (5th Cir. 1973) (per curiam) (alternate holding)). This is because, as the Ninth Circuit has observed,

> [t]he primary purpose of probation, which has become an integral part of our penal system, is to promote the rehabilitation of the criminal by allowing him to integrate into society as a constructive individual, without being confined for the term of the sentence imposed. An important aspect of our probation system is the placing of certain restrictions on the probationer, such as the requirement that he not associate with criminals or travel outside the judicial district. These conditions serve a dual purpose in that they enhance the chance for rehabilitation while simultaneously affording society a measure of protection. Because violation of probation conditions may indicate that the probationer is not ready or is incapable of rehabilitation by integration into society, it is extremely important that all reliable evidence shed-

ding light on the probationer's conduct be available during probation revocation proceedings.

*United States v. Winsett*, 518 F.2d 51, 54–55 (9th Cir.1975) (emphasis in original, footnote and citations omitted).

We believe that this reasoning as to probation revocation hearings, which has been followed by the vast majority of other courts which have dealt with the issue, *See United States v. Finney*, 897 F.2d 1047, 1048 (10th Cir.1990), and cases cited therein,[1] is equally applicable to supervised release revocation hearings. We note that in providing for the revocation of supervised release in 18 U.S.C. § 3583(e)(3), Congress provided that the court determination of whether revocation was warranted was to be made "pursuant to the provisions of the Federal Rules of Criminal Procedure that are applicable to probation revocation ..." While the exclusionary rule is not itself codified in the Federal Rules, we note that by the time Congress had adopted section 3583 in 1987, a majority of the Circuits had already held the exclusionary rule inapplicable to probation revocation hearings. Therefore, we do not believe that Congress intended that the exclusionary rule should apply to revocation of supervised release hearings.

Montez, relying on *Rea, supra,* note 1, argues that the exclusionary rule should apply in this case because the agents knew that he was on supervised release, and that therefore there would be deterrent effect by the rule's application. Given that such evidence, if it was in fact wrongfully seized, could not be used at a criminal trial, we believe that extending the exclusion to a supervised release revocation hearing "would achieve a deterrent effect specula-tive or marginal at best." *Winsett*, 518 F.2d at 54. This is because "[w]hen the police conduct a search, their aim generally is to convict the target of the search of a substantive offense, and they know that any unconstitutional conduct on their part incident to the search will be grounds for suppressing the evidence at the defendant's trial." *United States v. Bazzano*, 712 F.2d 826, 832 (3d Cir.1983) (en banc), *cert. denied sub nom Mollica v. United States*, 465 U.S. 1078, 104 S.Ct. 1439, 79 L.Ed.2d 760 (1984) (exclusionary rule not applicable to probation revocation hearings) (opinion of Judge Garth). In the aforementioned cases, save *Rea*, the officers were not aware of the probationary status of the targets of the searches. In a fact situation such as ours, however,

> even if extension of the rule may in fact achieve some deterrence of police misconduct, we must still balance the potential injury to the function of the proceedings in which the illegally obtained evidence is to be admitted or used. If the potential harm substantially outweighs potential benefits, then the rule should not be extended.

*Winsett*, 518 F.2d at 54.

As former Chief Justice Burger stated at his 1970 address to the Association of the Bar of the City of New York,

> [w]e take on a burden when we put a man behind walls, and that burden is to give him a chance to change.... If we deny him that, we deny him his status as a human being and to deny him that is to diminish our humanity and plant the seeds of future anguish for ourselves.

Note, *Do Illegal Searches Warrant Exclusion From Probation Revocation Hear-*

---

1. The refusal to extend the exclusionary rule to revocation hearings is not universal. The Second Circuit has held that, where a police officer has no knowledge that the target of the search is a probationer, the exclusionary rule will not apply to evidence illegally seized and introduced at a probation revocation hearing. *United States ex rel. Sperling v. Fitzpatrick*, 426 F.2d 1161, 1163–64 (2d Cir.1970). When, however, the search is conducted by a probation officer who, of course, is aware of the status of the target of the search, the rule will apply. *United States v. Rea*, 678 F.2d 382 (2d Cir.1982). As one commentator has remarked, "[t]he *Rea* court, in applying the exclusionary rule to probation revocation hearings, not only departed from the majority of the courts that have addressed this issue, but also from the [U.S. Supreme] Court's trend of restricting the scope of the rule." Note, *Do Illegal Searches Warrant Exclusion From Probation Revocation Hearings?*, 49 Brooklyn L.Rev. 1013, 1016 (1983). *See also United States v. Workman*, 585 F.2d 1205 (4th Cir.1978) (exclusionary rule does apply to probation revocation hearings).

*ings?,* 49 Brooklyn L.Rev. 1013, 1039 (1983).

Therefore, there is great value to society in the reintegration of its nonconforming members through supervised release. As discussed *supra,* however, this can only be achieved if the courts have all reliable information regarding the individual's conduct. Moreover, "excluding from such proceedings reliable evidence bearing on the [individual's] rehabilitation would contribute little to deterring constitutional violations while impeding society's interest in protecting itself against convicted criminals who have abused the liberty afforded them." *Bazzano,* 712 F.2d at 831 (opinion of Judge Garth). Finally, we must consider the effect of an exclusionary rule on the up-to-now informal process of evaluating and monitoring those on supervised release. Applying the exclusionary rule to revocation proceedings would force officers to spend more time and energy amassing formally admissible evidence.

After weighing these factors, we hold that the value to society of safely reintegrating former prisoners clearly outweighs whatever marginal benefit which might accrue from extending the exclusionary rule to supervised release revocation hearings which do not involve harassment.

■ In the case under review, the district court's implicit finding, by a preponderance of the evidence, that there was no harassment was not clearly erroneous. While in a situation such as this, where the agents knew that the one to be searched was on supervised release, the court must carefully review the agents' conduct to determine if harassment was involved, there was clearly none in this case. Montez does not contest that the agents had a valid warrant, and the map pocket in which the agents found the cocaine was large enough to contain the gun specified in the warrant. Moreover, the confidential informant had stated that Montez was dealing in drugs, and the agents' observations of the traffic in and out of Montez's place of employment were consistent with drug transactions.

Therefore, the district court did not err in admitting the seized cocaine.

## II. *The Evidence Sufficed for the District Court to Conclude that Montez Knowingly Possessed Cocaine.*

■ The Government's burden at the hearing was to prove, by a preponderance of the evidence, 18 U.S.C. § 3583(e)(3), that Montez knowingly possessed cocaine. The reasons mentioned in Part I which justified a finding of no harassment, in conjunction with the fact that Montez was in sole possession of the truck for over six hours prior to the seizure and that every time he started the truck he would have had to use the tool at the bottom of the map pocket, which contained the cocaine, also justify the district court's finding that Montez knowingly possessed the cocaine.

Montez proffered evidence that a man who had lived with Montez's daughter and had threatened "to get" Montez on several occasions was the confidential informant who provided the tip to the DEA. Moreover, Montez claimed that this man had used the truck the day of the search and seizure. The Government did not contest the proffer. Nevertheless, the finding of the district court that the Government had carried its burden was certainly not clearly erroneous.

## III. *Montez Has Waived His Argument Regarding Sentencing.*

■ Montez argues that the court should have, and did not, consider Chapter 7 of the United States Sentencing Guidelines. Chapter 7 expresses the views of the Sentencing Commission as to the proper remedies for violation of supervised release. These are policy statements which do not have the force of the Guidelines. We have not yet definitively decided how much force these policy statements have. We have stated, however, that "[e]ven if the policy statements are not *binding* on the courts, the court should still *consider* them in sentencing defendants." *United States v. Ayers,* 946 F.2d 1127, 1130 (5th Cir.1991) (emphasis in original).

According to U.S.S.G. § 7B1.4, which took effect eight days before the revocation hearing, the range of imprisonment, assuming simple possession in conjunction

with Montez's criminal history category of I, would have been three to nine months. Section 7B1.4(b)(2), however, would have required the court to substitute the minimum statutory term, one year according to 18 U.S.C. § 3583(g).

At the revocation hearing, Montez's counsel discussed the statutory sentencing options with the district judge but never mentioned the Guidelines. Neither did Montez's counsel object when the court stated its belief that it could sentence Montez to up to three years incarceration. Moreover, Montez's counsel did not object when sentence was pronounced. In *Ayers*, we dealt with a similar supervised release situation in which the record did not indicate that the district court had considered the Chapter 7 policy statements and where the defendant "did not object or otherwise raise this issue at the revocation hearing." *Id.* at 1131. As the issue was raised for the first time on appeal, we would not consider it since there was no "plain error." "Plain error is error which, when examined in the context of the entire case, is so obvious and substantial that failure to notice and correct it would affect the fairness, integrity, or public reputation of the judicial proceedings." *Id.*[2]

While Chapter 7 suggests a one year sentence,

> [t]he district court had discretion to impose the same sentence as that pronounced. We presume that the court imposed such sentence under all the circumstances of this case. The failure to articulate a consideration of the policy statements was not plain error.

*Id.*

## CONCLUSIONS

Even if the seizure of the cocaine violated Montez's Fourth Amendment rights, the district court did not err in allowing this evidence into the proceeding because, absent harassment, the exclusionary rule does not apply to revocation of supervised release hearings. Moreover, the district court did not err in finding that the government had met its burden, under the preponderance standard, that Montez knowingly possessed the cocaine. Finally, since the district court did not commit plain error sentencing Montez to a prison term within the statute, we will not now consider whether the court erred in failing to consider the Guideline policy statements.

The order of the district court is AFFIRMED.

---

2. Despite Montez's implicit assent at the revocation hearing that the court had the discretion to sentence him to three years incarceration, he now contends that since simple possession is a Class C violation under the Guidelines and that therefore, according to 18 U.S.C. § 3583(e)(3), the maximum sentence was two, not three years. At oral argument, however, defense counsel made clear that he was not now claiming that the district court erred in a misapprehension of the statutory maximum. In any event, this argument was not raised before the district court, which did not in fact impose a sentence over the statutory maximum. Therefore, we will not address the issue on appeal.