1 F.3d 1242
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Robin BLACKSHEAR, Defendant-Appellant.
 No. 92-3881.
 United States Court of Appeals, Sixth Circuit.
 July 29, 1993.
 
 Before NELSON and SUHRHEINRICH, Circuit Judges, and EDMUNDS, District Judge.*
 PER CURIAM.
 
 
 1
 Defendant Robin Blackshear appeals the district court's finding that he violated the conditions of his supervised release; he also appeals the sentence consequently imposed. Defendant contends that (1) the court erred in admitting evidence obtained in violation of the Fourth Amendment; and (2) the evidence was insufficient to establish that he distributed or intended to distribute cocaine, or that he possessed the guns found in his residence. For the following reasons, we AFFIRM.
 
 I.
 
 2
 In 1988, defendant/appellant Robin Blackshear plead guilty to distribution of a controlled substance near a school pursuant to 21 U.S.C.A. Sec. 841(a)(1). He was sentenced to 33 months of incarceration and five years of supervised release. The district court imposed the standard conditions of supervised release, as well as a condition restricting the defendant's possession of firearms and a requirement that the defendant submit to random drug testing.
 
 
 3
 In March 1992, Blackshear tested positive for cocaine in a random urinalysis. As a result of the positive test, two members of the federal probation department went to 1140 Walnut Northeast, Canton, Ohio, the address provided by Blackshear as his residence, to obtain another urine sample for analysis. That sample, taken on April 9, 1992, also tested positive for cocaine.
 
 
 4
 Unknown to the probation officers, while they were inside 1140 Walnut Northeast, members of the Canton Police Department were preparing to execute a state search warrant on the residence. The warrant authorized a search of "1140 Walnut North East, McKinley Township, Stark County, Canton, Ohio" and "the persons/occupants in or on" that premises for drugs and drug paraphernalia. The warrant was executed after the probation officers left the house.
 
 
 5
 Pursuant to the warrant, the police officers seized narcotics (1.66 grams of cocaine), narcotics paraphernalia, weapons, and cash. The defendant's federal probation officers were advised of the results of the search, and a supervised release violation warrant was issued. That warrant incorporated the two positive drug tests as well as the weapons and narcotics seized during the search. Blackshear was eventually indicted on state firearm and narcotics offenses.
 
 
 6
 The federal supervised release revocation proceedings were stayed pending the state court trial. A jury acquitted the defendant of the state charges on July 21, 1992, and on August 19, 1992, the district court conducted the supervised release revocation hearing. Blackshear moved to suppress the evidence seized pursuant to the state search warrant, claiming that the search exceeded the scope of the warrant. Relying on United States v. Farmer, 512 F.2d 160 (6th Cir.1975), the district court denied the motion, stating that "[u]nder the law of that case it is not necessary to hold a hearing on a suppression motion in a probation violation proceeding." The court then heard testimony regarding the supervised release violations.
 
 
 7
 In support of the alleged violations, the government called three witnesses: Nora Riley, one of the defendant's probation officers, Detective Gregory Boudreaux of the Canton Police Department, a member of the team which executed the search warrant, and Tim Swanson, a Stark County Sheriff's Deputy who participated in the search.
 
 
 8
 Riley testified to the positive urinalysis results obtained in random drug tests conducted on March 24, 1992 and April 9, 1992. She also indicated that both doors to Blackshear's residence were barricaded.
 
 
 9
 The government then called Detective Boudreaux, who had executed the search warrant at 1140 Walnut North East. Boudreaux indicated that on his initial search of Blackshear, he found a cigar tube containing what appeared to be crack cocaine and $3,000 in currency in Blackshear's pockets. According to Boudreaux, Blackshear told him that he (Blackshear) had found the tube of cocaine earlier that day and that he was going to throw it away. Boudreaux read the defendant his rights and asked him if there were any weapons in the house. The defendant indicated that there was a handgun in a kitchen drawer. While a search of the drawer revealed no weapons, Boudreaux did find plastic cigar tubes similar to the one found in the defendant's shirt pocket. Blackshear then stated that there was a gun in the living room under a couch.
 
 
 10
 Boudreaux testified that "several" controlled drug buys had been made at the Walnut address prior to April 9, 1992, and that the controlled buys had helped establish probable cause for issuing the April 9 search warrant. Boudreaux identified one of the twenty dollar bills found in Blackshear's pocket as currency used in one of the controlled buys. Boudreaux admitted, however, that he had not been personally involved in the controlled buys, and that he could give not details as to how the twenty dollar bill came into the defendant's possession.
 
 
 11
 Finally, the government called Officer Swanson, who testified that a razor blade and container with white residue, a box of baking soda, white crumbs, and a plastic cigar tube were found in the kitchen of 1140 Walnut pursuant to the April 9, 1992 search. The white residue and the white crumbs tested positive for cocaine. Swanson also testified that he found a loaded gun under a chair cushion in the front room and a second loaded weapon in an upstairs bedroom. In the bedroom with the weapon, the search team also found a tube with white residue testing positive for cocaine, personal papers with the defendant's name on them, and a wad of cash stuffed into the base of a lamp.
 
 
 12
 The defendant's first witness was Judy Patterson, who testified with respect to the ownership of the Walnut Street residence. Defendant then called Marie Miniefield, his fiancee, who testified that she and Blackshear lived together at 1140 Walnut from October 1991 until late February or early March, 1992, when Blackshear moved out because of her cocaine and crack abuse. Miniefield acknowledged that she used cocaine and that she occasionally cooked crack in a coffee pot in the kitchen of the Walnut residence. While she admitted to having cooked crack six or seven times in late March or early April, 1992, she testified that she had not told Blackshear about it.
 
 
 13
 According to Miniefield, on the morning of April 9, 1992, prior to the search, one of her girlfriends came to the Walnut residence and asked for a container for her crack cocaine. Miniefield allegedly gave the girl a cigar tube and Miniefield observed the girl place crack inside of it. Miniefield stated that her friend must have dropped the tube in the kitchen, because Blackshear found it later in the day, and thinking that it belonged to Miniefield, stated that he was going to throw it away.
 
 
 14
 That same day, prior to the execution of the search warrant, another one of Miniefield's friends, Rosemary Starcher, came to the house and asked for change for a twenty dollar bill. Miniefield had the change and gave it to her. Starcher returned later that morning, again seeking change for a twenty dollar bill. The second time, Miniefield made change from currency in the defendant's coat pocket, which was hanging in the upstairs bathroom of the Walnut residence.
 
 
 15
 Miniefield testified that she had given Starcher change for a twenty dollar bill two days earlier, on April 7, 1992. At that time, Starcher told Miniefield that she had two guns for sale. Miniefield purchased the guns the following day, April 8, 1992. She placed one in the living room and the other one in the bedroom. She did not tell Blackshear about the weapons until after his probation officers left on April 9, 1992, and she never told him where the weapons were located.
 
 
 16
 Finally, the defendant testified on his own behalf. He testified that he had been living with Marie Miniefield at 1140 Walnut until early March, 1992, when he moved out because of her drug abuse. On the morning of April 9, 1992, his probation officers came to 1140 Walnut to obtain a urine sample. While complying with their request, he left his jacket in the upstairs bathroom of the Walnut address. He denied having used drugs, but stated that he had made coffee in a pot which he later learned had been used by Miniefield for cooking crack.
 
 
 17
 Blackshear reiterated Miniefield's testimony that Rosemary Starcher had asked for change for a twenty dollar bill. He testified that the $3,000 found by Detective Boudreaux was a loan from Reverend Clement Lee, the leader of a local church. The loan was intended to help the defendant remodel a storefront into a carry out restaurant. Blackshear denied owning the guns found during the search and stated that while Miniefield told him that she had purchased two guns, she did not tell him where they were located, nor did he tell Detective Boudreaux where they were located.
 
 
 18
 At the close of the testimony and arguments, the court found "the testimony of the witnesses for the defendant to be not credible." Specifically, the court noted that "[t]he number of coincidences the Court is asked to believe is simply too great to be believable." The court concluded that the defendant had violated three conditions of supervised release: number 8 regarding possession and use of controlled substances, number 9, prohibiting the frequenting of places where controlled substances are used, and number 15 regarding possession of firearms. The court then recessed the hearing pending the filing of sentencing memoranda by the parties.
 
 
 19
 At the sentencing on August 26, 1993, the parties agreed that the firearms violation was a Grade B violation pursuant to United States Sentencing Guidelines Sec. 7B1.1(a)(2), and the court found that the drug violation constituted a Grade A violation pursuant to U.S.S.G. Sec. 7B1.1(a)(1). The Court sentenced the defendant to 30 months incarceration and the defendant appealed.
 
 II.
 A. Inapplicability of Exclusionary Rule
 1. Harassment Exception
 
 20
 Prior to the revocation hearing, the district court, relying on United States v. Farmer, 512 F.2d 160 (6th Cir.1975), cert. denied 423 U.S. 987 (1975) declined to conduct a suppression hearing and denied the defendant's motion to exclude evidence seized pursuant to the search warrant. The defendant appeals that decision on two grounds. First, he asserts that while Farmer held the exclusionary rule inapplicable to probation revocation hearings, it recognized an exception in cases of police harassment. The defendant asserts that this case should be remanded because the district court made no explicit findings regarding harassment, and this Court cannot infer such findings from the record. Second, the defendant urges this Court to re-examine the holding of Farmer in light of its decision in United States v. Stephenson, 928 F.2d 728 (6th Cir.1991), which drew distinctions between supervised release and probation for purposes of determining the maximum possible sentence upon revocation. According to the defendant, this Court should draw a distinction between probation and supervised release for purposes of applying the exclusionary rule at revocation hearings.
 
 
 21
 While the defendant concedes that as a general matter, the exclusionary rule is inapplicable to probation or supervised release revocation proceedings[1], he asserts that an exception exists in cases involving police harassment and that "there must be a finding by a district court, explicitly or implicitly, that there was no harassment." He relies primarily on United States v. Farmer, 512 F.2d 160 (6th Cir.1975), and United States v. Montez, 952 F.2d 854 (5th Cir.1992).
 
 
 22
 In Farmer, a panel of this Court held that the Fourth Amendment exclusionary rule does not apply to probation revocation proceedings. Pursuant to that holding, the Court noted that "[t]his case [Stephenson] does not involve harassment by the police so that an exclusion rule should be invoked to prevent recurrence," thus implying the existence of an exception in cases of harassment. Id. at 162. Similarly, in Montez, the Fifth Circuit held that the exclusionary rule does not apply to "supervised release revocation hearings which do not involve harassment" and went on to find that the district court had implicitly found no evidence of harassment. Id. at 859.[2]
 
 
 23
 Assuming, without deciding, that the Sixth Circuit recognizes a police harassment exception, this Court need not address whether the district court should have applied the exception to the case at bar because the defendant made no factual allegations of harassment. Nowhere in the record did the defendant allege that the state police officials executing the warrant knew that he was on supervised release or that the search was conducted in an effort to harass him. Similarly, his brief to this Court contains no factual allegations of harassment. Because no allegations of harassment were raised, and the defendant cites no authority supporting the proposition that the district court should have raised the issue sua sponte, the district court did not err in failing to make findings regarding harassment.
 
 
 24
 2. Comparison With Probation Violation Proceedings
 
 
 25
 The defendant next asserts that this Court should examine the applicability of Farmer, a probation revocation case, to supervised release revocation cases in light of United States v. Stephenson, 928 F.2d 728 (6th Cir.1991). Most courts refusing to apply the exclusionary rule to supervised release revocation proceedings justify that refusal by making them analogous to probation violation proceedings. According to the Defendant, however, Stephenson recognized differences between the two proceedings and "due process demands that the exclusionary rule should apply to supervised release revocation hearings whether or not applicable to probation revocation hearings." (Defendant's brief at 12).
 
 
 26
 In Stephenson, the defendant was challenging the length of the sentence imposed upon revocation of supervised release. He asserted that the maximum sentence he could receive was equal to the maximum time allowed in the guideline range for his original offense less time already served. In support of his position, he relied on probation revocation cases which held that, pursuant to 18 U.S.C. Sec. 3565(a)(2), the maximum allowable sentence upon revocation of probation is limited to the term allowable for the original offence under the guidelines.
 
 
 27
 In rejecting that argument, the Court noted that while resentencing upon revocation of probation is controlled by Sec. 3565, resentencing upon revocation of supervised release is controlled by 18 U.S.C. Sec. 3583(e). "The plain language of Sec. 3583(e) grants the court discretion to resentence the defendant for any period up to the whole period of supervised release with certain limiting exceptions." Id. at 730. The Court went on to explain:
 
 
 28
 The inherent differences between supervised release and probation necessitate this difference in structure. In probation, because the defendant will not have served time for his offense, the court may consider the guidelines range of the original offense as the possible incarceration period. In supervised release, however, the individual will have already served time, possibly the maximum allowed under the Guidelines. Connecting the resentencing period with the maximum period of incarceration allowed for the original offense would undermine the system of supervised release. If the resentencing period was connected and the defendant had already served a substantial part or all of his allowable term under the Guidelines, his violation of a condition of supervised release would result in a tenuously short period of reincarceration, or no reincarceration at all. The possibility of reincarceration for violation of a condition of supervised release is a cornerstone of the sentencing structure.
 
 
 29
 Id. at 730-31.
 
 
 30
 Once the Stephenson Court articulated the different purposes served by probation and supervised release, it concluded that different resentencing structures were appropriate. No such conclusion is evident in the context of applying the exclusionary rule. The defendant articulates no underlying difference between probation revocation hearings and supervised release revocation hearings sufficient to support application of the exclusionary rule in one proceeding but not the other. Because no such distinction is apparent to this Court, we find that the district court properly held the exclusionary rule inapplicable to supervised release revocation hearings.
 
 
 31
 B. Sufficiency of the Evidence and Related Sentencing Issues
 
 
 32
 The district court found that the defendant violated three conditions of supervised release; number eight, prohibiting the possession or use of controlled substances, number nine, prohibiting the defendant from frequenting places where controlled substances are illegally used or administered, and number fifteen, prohibiting possession of firearms. The parties agreed that the firearm violation was a grade B violation, and the court found that the cocaine possession violation was a grade A violation. Pursuant to U.S.S.G. Sec. 7B1.1(b), the defendant's sentence was determined by the violation with the higher grade.[3]
 
 
 33
 Blackshear challenges the court's findings on two grounds. First, he concedes that while the evidence presented may have been sufficient to prove that he possessed cocaine, a grade B violation, the evidence was not sufficient to establish that he distributed, or intended to distribute cocaine, an element necessary to support the court's finding of a grade A violation.[4] Second, the defendant asserts that there was insufficient evidence to support the court's finding that he "possessed" the guns found in the house.
 
 
 34
 Before revoking supervised release, a district court must find, by a preponderance of the evidence, that a condition has been violated. 18 U.S.C. Sec. 3583(e)(3); United States v. Stephenson, 928 F.2d 728, 733 (6th Cir.1991). The district court is given broad discretion in reaching that conclusion. Stephenson, 928 F.2d at 732. The district court is the fact finder and hearsay is admissible. Id. at 732-33. In reviewing the district court's findings regarding such violations, this Court is limited to determining whether the lower court abused its discretion. Id. at 731. While the defendant submits that there is no reliable evidence to indicate that he did more than simply possess cocaine, a review of the record does not support defendant's conclusion.
 
 
 35
 The district court found "the testimony of the witnesses for the defendant to be not credible." Thus, it appears that the Court believed the testimony of the government's witnesses. Taken as a whole, those witnesses presented persuasive evidence of intent to distribute cocaine. Specifically, they established that state law enforcement officers had conducted several controlled drug buys out of the 1140 Walnut premises; that the front door of the residence was barricaded; that the back door had a barricade type lock and the view into the back yard was obstructed by a fence; that pursuant to a search of the property, police seized two loaded guns, a wad of cash located in the base of a lamp, a test tube with white cocaine residue, a razor blade with white residue, a coffee pot with cocaine residue, crumbs of cocaine and an empty cigar tube; and that pursuant to a search of the defendant's person, police seized a cigar tube containing crack cocaine and $3,000 in cash, including a twenty dollar bill used in a previous undercover buy.
 
 
 36
 While the evidence regarding Blackshear's intent to distribute cocaine is circumstantial, this Court cannot conclude that the district court below committed "a clear error in judgment" in concluding that the defendant was involved in the distribution of cocaine. Taylor v. United States Parole Comm'n, 734 F.2d 1152, 1155 (6th Cir.1984) (citations omitted).
 
 
 37
 The same is true with respect to the defendant's assertion that "there is not a preponderance of evidence that the defendant 'possessed' the guns found in the house." While he argues that the testimony of Marie Miniefield and the defendant serve "to balance the testimony of the officers," the district court found that the defendant's witnesses were not credible. In light of Officer Boudreaux's testimony that the defendant directed him to the weapons, the district court did not commit a clear error in judgment in concluding that the defendant violated supervised release condition 15 regarding possession of firearms.
 
 C. Sufficiency of Written Order
 
 38
 The defendant next asserts that the district court's written Order of Revocation of Supervised Release and Sentencing of Imprisonment violated his due process rights because it failed to state what evidence the court relied on in reaching its conclusion. Blackshear maintains that this matter should be remanded "so that a proper written order may be submitted and, if necessary to its preparation, additional proceedings as needed."
 
 
 39
 In United States v. Stephenson, 928 F.2d 728 (6th Cir.1991), a panel of this Court recognized that "among the minimum requirements of due process is a 'written statement by the factfinder[ ] as to the evidence relied on and the reasons for revoking [supervised release].' " Id at 733, citing Morrissey v. Brewer, 408 U.S. 471, 489 (1972). The written statement requirement provides a basis for review as well as encouraging accuracy in fact finding. Black v. Romano, 471 U.S. 606, 613-14 (1985).
 
 
 40
 The written order in this case does not state what evidence the court relied on in concluding that the defendant violated the conditions of supervised release. Therefore, the defendant is correct in asserting that the district court's order does not strictly comply with the requirements set forth in Stephenson. However, the Sixth Circuit recently joined several other circuits in holding that the transcribed oral findings of a district court can satisfy the requirement of a written statement. United States v. Gilbert, 990 F.2d 916 (6th Cir.1993). See also United States v. Copley, 978 F.2d 829 (4th Cir.1992); United States v. Barth, 899 F.2d 199 (2d Cir.1990), cert. denied --- U.S. ----, 111 S.Ct. 953 (1991); United States v. Yancey, 827 F.2d 83 (7th Cir.1987), cert. denied, 485 U.S. 967 (1988); Morishita v. Morris, 702 F.2d 207 (10th Cir.1983); contra United States v. Smith, 767 F.2d 521 (8th Cir.1985); United States v. Lacey, 648 F.2d 441 (5th Cir. Unit A 1981).
 
 
 41
 A review of the written transcript of Blackshear's revocation hearing discloses the following findings and judgment from the district judge:
 
 
 42
 I have listened to the testimony and I have reviewed the evidence in this case which is not voluminous, and the Court finds the testimony of the witnesses for the defendant to be not credible. The number of coincidences the Court is asked to believe is simply too great to be believable.
 
 
 43
 The Court finds that by a preponderance of the evidence, and indeed by probably a great deal more than that, the defendant has been shown to have violated the following conditions of supervised release: [numbers eight, nine and fifteen].
 
 
 44
 (Transcript at 137-38). The district court based its findings on the testimony of the government's witnesses rather than the testimony of the defendant's witnesses. While the district court's findings may not be a model of specificity, in light of the record as a whole, they adequately apprise both the defendant and this Court of the evidence relied on in revoking Blackshear's supervised release. Defendant's due process claim is therefore, without merit.
 
 
 45
 For the foregoing reasons, the order of the district court is hereby AFFIRMED.
 
 
 
 *
 Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 See United States v. Montez, 952 F.2d 854 (5th Cir.1992) (supervised release); United States v. Bazzano, 712 F.2d 826 (3d Cir.1983), cert. denied, 465 U.S. 1078 (1984) (probation); United States v. Frederickson, 581 F.2d 711 (8th Cir.1978) (probation); United States v. Winsett, 518 F.2d 51 (9th Cir.1975) (probation); United States v. Brown, 488 F.2d 94 (5th Cir.1973) (probation); United States v. Hill, 447 F.2d 817 (7th Cir.1971) (probation); contra, United States v. Rea, 678 F.2d 382 (2d Cir.1982) (probation); United States v. Workman, 585 F.2d 1205 (4th Cir.1978) (probation)
 
 
 [2]
 See also United States v. Bazzano, 712 F.2d 826, 833 n. 1 (3rd Cir.1986) (exclusionary rule does not generally apply to revocation proceedings, but an exception may exist where officer is aware of defendant's probationary status); United States v. Winsett, 518 F.2d 51, 53-54 n. 5 (9th Cir.1975) (same); United States v. Finney, 897 F.2d 1047, 1048 (10th Cir.1990) (acknowledged possible exception to general rule but refused to reach the issue because record did not indicate that officer knew of defendant's probationary status)
 3 U.S.S.G. Sec. 7B1.1 states:
 (a) There are three grades of probation and supervised release violations:
 (1) Grade A Violations--conduct constituting (A) a federal, state, or local offense punishable by a term of imprisonment exceeding one year that (i) is a crime of violence, (ii) is a controlled substance offense, or (iii) involves possession of a firearm or destructive device of a type described in 26 U.S.C. Sec. 5845(a); or (B) any other federal, state, or local offense punishable by a term of imprisonment exceeding twenty years;
 (2) Grade B Violations--conduct constituting any other federal, state, or local offense punishable by a term of imprisonment exceeding one year;
 (3) Grade C Violations--conduct constituting (A) a federal, state, or local offense punishable by a term of imprisonment of one year or less; or (B) a violation of any other condition of supervision.
 (b) Where there is more than one violation of the conditions of supervision, or the violation includes conduct that constitutes more than one offense, the grade of the violation is determined by the violation having the most serious grade.
 U.S.S.G. Sec. 4B1.2(2) states:
 The term 'controlled substance offense' [referred to at (a)(1)(ii) above] means an offense under a federal or state law prohibiting the manufacture, import, export, distribution or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense.
 
 
 [4]
 The government filed a sentencing memoranda with the district court which indicated that the applicable sentencing range for a Grade A violation in this case was 24-30 months, while the range for a Grade B violation was 12-18 months