NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0384n.06

Case No. 24-1167

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| Plaintiff-Appellee, | ) | Sep 11, 2024 |
|  | ) | KELLY L. STEPHENS, Clerk |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| YOUSEF MOHAMMAD RAMADAN, | ) |  |
| Defendant-Appellant. | ) |  |
|  | ) | OPINION |

Before: SUTTON, Chief Judge; COLE and THAPAR, Circuit Judges.

SUTTON, C.J., delivered the opinion of the court in which COLE and THAPAR, JJ., joined. THAPAR, J. (pp. 12–14), delivered a separate concurring opinion.

SUTTON, Chief Judge. Yousef Ramadan challenges the district court's decision to revoke his supervised release and impose a new sentence. We affirm.

I.

In August 2017, federal officers stopped Yousef Ramadan at the Detroit Metropolitan Airport and searched his luggage. They discovered weapons, armor, and various electronic devices. The devices contained ISIS propaganda, videos of a homemade pipe bomb, and photos of Ramadan posing with weapons. Ramadan told the officers that he owned some firearms in a storage unit. Agents searched the unit a week later, uncovering firearms with obliterated serial numbers and a makeshift silencer. A federal jury convicted Ramadan on three firearms charges.

In February 2022, the district court sentenced him to time served and two years of supervised release. It also imposed several conditions on his release, three of which matter today. One condition barred Yousef from owning a "dangerous weapon." A second condition required him to "submit . . . any property under his control to a search." And a third prohibited him from interacting with criminals. R.299 at 3–5. We rejected Ramadan's constitutional and evidentiary challenges to his conviction. *United States v. Ramadan*, No. 22-1243, 2023 WL 6634293 (6th Cir. Oct. 12, 2023).

A few weeks into his supervised release, Ramadan bought a pellet handgun from Amazon. Ramadan's parole officer told him that the gun violated the terms of his supervised release, and Ramadan returned it. In October 2023, the FBI learned that Ramadan had bought another gun, a fully automatic AK-style air rifle. Officers searched his home and uncovered the air rifle as well as several phones and computers. Ramadan repeatedly refused to disclose the passwords for his electronic devices, and the officers eventually obtained access to them in other ways. The devices contained encrypted text conversations with members of ISIS, manuals for building explosives, and a photo of Ramadan in an ISIS-style mask posing with the air rifle.

The district court determined that Ramadan's conduct violated three conditions of his supervised release. His ownership of the air rifle violated the "dangerous weapon" condition. His refusal to disclose passwords violated the "consent search" condition. And his encrypted conversations violated the "communications with known criminals" condition.

The district court imposed two months' incarceration, which fell below the Guidelines range of three to nine months. It also imposed thirty-four months of supervised release, the statutory maximum, with several new conditions of release. 18 U.S.C. § 3583(b)(2), (h). One new

condition barred Ramadan from seeking out "material that relates to any designated terrorist organization." R.337 at 6.

## II.

## A.

Did Ramadan violate the "dangerous weapon" and "consent search" conditions of his supervised release? We review the district court's legal conclusions on this score anew, its fact findings for clear error, and its final decision to revoke supervised release for an abuse of discretion. *United States v. Kontrol*, 554 F.3d 1089, 1091–92 (6th Cir. 2009).

*Dangerous weapon condition.* This condition barred Ramadan from owning a "dangerous weapon (i.e., anything that was designed, or modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers)." R.299 at 4; *see* U.S.S.G. § 5D1.3(c)(10). The air rifle satisfies this test.

The air rifle functions like an automatic weapon. It can fire over a thousand rounds of steel ammunition per minute. The United States Product Safety Commission found that BB guns and pellet rifles kill about four people per year. It also noted that high-velocity air rifles, like the one that Ramadan owned, pose a particularly high risk of death. This weapon also resembles a real gun. Its appearance mimics an AK-style assault rifle, and it lacks the orange muzzle tip that must accompany toy guns. These features of the air rifle have the potential to attract wrongdoers, particularly felons who are not permitted to buy other firearms. The air rifle was designed to shoot, look, and feel like a real firearm, and it could be used to injure or kill like one too. All in all, the air rifle satisfies the requirement that it be "designed" for the "specific purpose" of "causing bodily injury."

Ramadan claims that, because the condition covers dangerous weapons designed with the "specific purpose" of causing injury or death, the government must show that this weapon was *solely* designed to harm others. But this reading runs into the reality that the provision lists tasers as dangerous weapons. Tasers may be used to incapacitate, and not just injure, individuals. The better reading is that "specific" means that one of the weapon's purposes "fall[s] into the category specified," Merriam-Webster Unabridged Online (2024), in this instance to cause bodily harm. That explains why tasers count as dangerous weapons. One of their purposes is the "specific" one of injuring others. This definition of "specific" appears elsewhere in criminal law. A defendant, for instance, commits a "specific intent" crime if he acts with the "specific" prohibited intent, even if that intent was not his sole motivation. *See, e.g.*, *United States v. $525,695.24*, 869 F.3d 412, 419 (6th Cir. 2017). Because an air rifle is "designed" for the "specific purpose" of "causing bodily injury," it amounts to a "dangerous weapon."

Ramadan claims that the provision is impermissibly vague and thus denied him fair notice that his purchase would violate this condition. But he is not a promising candidate to raise this argument. He had actual notice that he could not own this gun. Before he purchased this air rifle, his parole officer told him that he could not own another, less threatening one. The provision, at all events, is not unconstitutionally vague. The term "dangerous weapon" is defined in the condition itself, along with several examples of qualifying items such as tasers. That guidance suffices to show a "person of ordinary intelligence" what the term means. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Notably, every circuit to face this issue has rejected the challenge. *See, e.g.*, *United States v. Garcia-Mejia*, 394 F.3d 396, 397–98 (5th Cir. 2004) (per curiam); *United States v. Speed*, 811 F.3d 854, 861 (7th Cir. 2016).

4

*Consent search violation.* This condition permitted the revocation of supervised release if Ramadan failed to "submit . . . any property under his control to a search." R.299 at 5. Ramadan did not raise this challenge below, requiring us to review it for plain error. *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc). He thus must show a clear error, one that would undermine the integrity of the criminal justice system if left uncorrected. *United States v. Olano*, 507 U.S. 725, 736 (1993).

Ramadan cannot meet this demanding standard. He owned the computer devices. So he cannot plausibly deny that they were "property under his control." Nor can he deny that he refused to submit to a search of them. No error occurred, much less one that was "obvious or clear." *Vonner*, 516 F.3d at 386 (quotation omitted).

Ramadan counters that the government needed to specify in this condition that "any property" included the contents of his electronic devices. As support, he points to cases that excluded evidence obtained from warrantless searches of arrestees' and probationers' cell phones. *See United States v. Fletcher*, 978 F.3d 1009, 1019 (6th Cir. 2020); *Riley v. California*, 573 U.S. 373, 396–97 (2014). But these Fourth Amendment cases do not tell us how to interpret the language of a condition of supervised release. Individuals on supervised release have fewer liberty interests than arrestees or probationers. *See Fletcher*, 978 F.3d at 1018–19. Hence the government's authority to require them to submit to searches with or without probable cause and with or without a warrant. Hence the reality that the exclusionary rule does not apply in revocation proceedings. *See United States v. Robinson*, 63 F.4th 530, 536 (6th Cir. 2023). His electronic devices were readily covered by this condition's capacious reference to "any property under his control."

5

B.

Ramadan argues that one of his new conditions of supervised release is unconstitutionally vague in violation of the Fifth Amendment and breaches his free-speech rights in violation of the First Amendment. The relevant provision bars Ramadan from "seek[ing] to possess, view, access, or otherwise use material that relates to any designated foreign terrorist organization." R.337 at 6. That provision links to a State Department website which lists these terrorist groups.

Before turning to each challenge, it is well to remember why appellate courts give considerable latitude to district courts in imposing conditions on a criminal defendant's new freedom. The idea behind conditions of supervised release is to facilitate a defendant's "re-entry into society" sooner rather than later. *United States v. Shultz*, 733 F.3d 616, 624 (6th Cir. 2013). The benefit of release comes with the burden of conditions on that release, and the rights of third parties are not at stake because the condition "binds just one defendant." *Id.* Given a trial court's "front-row seat at the proceedings and its sentencing experience, we generally respect its imposition of supervised-release conditions in the absence of an abuse of discretion." *Id.* at 619.

*Vagueness challenge.* Concerns about unconstitutional vagueness do not require district courts to do the impossible. They cannot anticipate every possible way in which a condition might apply. Hence any such "condition, no less than a statute, need not spell out every one of its applications." *Id.* at 622. It suffices to "fix an ascertainable standard of guilt." *Id.* (quotation omitted). In this setting, we hesitate before "entertaining facial challenges to conditions of supervised release." *Id.* at 624. Instead, we consider the context of the proceedings. *Id.* Through it all, supervised-release conditions "should be written—and must be read—in a commonsense way." *Id.* (quotation omitted). "Pursuit of drafting perfection does little good and threatens much harm." *Id.*

The district court limited Ramadan's access to material with respect to foreign terrorist organizations in response to the "dangerous information" contained on Ramadan's devices. R.342 at 12. The court noted its "extreme[] concern[]" over Ramadan's viewing of "violent activity by ISIS, including the execution of individuals," and his downloading instructions for creating "weapons," "poison," and "explosives." R.342 at 12. These past actions did not offer promising prospects for rehabilitation or augur well for lack of danger to the public from his release. Given the context of these proceedings, this condition bars Ramadan from intentionally seeking out terrorist propaganda like the kind uncovered on his devices before. Such a reading adequately "fix[es] an ascertainable standard of guilt" by outlining the prohibited actions: seeking out terrorist propaganda and ways to injure people. *Shultz*, 733 F.3d at 622.

Ramadan argues that he lacks notice on what behavior would violate this condition. But this condition is no more vague than other conditions we have upheld, such as a restriction on "any material" a defendant "may use for the purpose of deviant sexual arousal." *Id.* at 623. Other courts have upheld similar conditions. The Fourth Circuit rejected a vagueness challenge to a condition requiring that a defendant "not view, possess, access, or use material that reflects extremist or terrorist views or is deemed inappropriate by the U.S. Probation Office." *United States v. Amin*, 85 F.4th 727, 732, 737–39 (4th Cir. 2023). The Second Circuit upheld a condition that said a defendant could "not access any website[] that affiliates with a radical extremist group, terrorist organization, organized crime groups, gangs, or any criminal enterprise or terrorist enterprise." *United States v. Rakhmatov*, No. 21-151, 2022 WL 16984536, at *3 & n.1 (2d Cir. Nov. 17, 2022). The commonsense meaning of the word "seek" in his condition means that Ramadan, like these other individuals, may not pursue the prohibited material, as opposed to randomly hear about it or

see it. Such a "scienter requirement[]" often "alleviate[s] vagueness concerns," *Gonzales v. Carhart*, 550 U.S. 124, 149 (2007), and it does so here.

Ramadan claims that his condition is just as vague as one we refused to enforce in *United States v. Sexton*, 719 F. App'x 483, 485 (6th Cir. 2017) (per curiam). The comparison is inapt. That condition required the defendant "to notify third parties of risks that may be occasioned by [his] criminal record or personal history or characteristics." *Id.* at 484 (quotation omitted). That defendant was left without any guidance as to what third parties must be notified, which aspects of his personal history or characteristics are risk factors, and what risks he must disclose. *Id.* at 484–85. And that condition affirmatively obligated disclosure, which meant the defendant could violate it accidentally. In this instance, the "seeking" requirement and the absence of an affirmative reporting obligation make it much less likely that Ramadan could violate it accidentally.

This affirmance is not necessarily the end of the story. Nothing prohibits Ramadan in the future from asking his probation officer and, if need be, the district court whether the condition covers certain activity. The district court, notably, invited Ramadan to propose alternative language to this provision to resolve any ambiguities. Even though Ramadan declined the invitation then, he is free to seek any clarification in the future. *See United States v. Zobel*, 696 F.3d 558, 575 (6th Cir. 2012) (quotation omitted).

*Free speech challenge.* In a variation on a theme, Ramadan claims that uncertainties over the meaning of this condition of supervised release violate his free-speech rights. Much of what we have said already thus applies to this argument as well. Defendants on supervised release do not enjoy the same free speech rights as ordinary citizens. *Shultz*, 733 F.3d at 624. Conditions generally survive constitutional scrutiny so long as they "meet the ends of rehabilitation and

8

protection of the public." *Zobel*, 696 F.3d at 576 (quotation omitted). And courts, where necessary, may give a provision a "narrowing construction" to avoid any potential constitutional problems. *Shultz*, 733 F.3d at 625.

Ramadan's condition "meet[s] the ends of rehabilitation and protection of the public" by helping to deradicalize Ramadan. *Zobel*, 696 F.3d at 576. Distancing Ramadan from terrorist propaganda and terrorist training materials helps him rejoin society (rehabilitation) and prevents future terrorist activities (protection of the public). Other courts have affirmed similar restrictions on terrorist materials. The Fourth Circuit rejected a free-speech challenge to a condition requiring that a defendant "not view, possess, access, or use material that reflects extremist or terrorist views or is deemed inappropriate by the U.S. Probation Office." *Amin*, 85 F.4th at 732, 737–39. And the Second Circuit rejected a free-speech challenge to a condition that barred a defendant from accessing any website that affiliates with a terrorist group. *Rakhmatov*, 2022 WL 16984536, at *3 & n.1.

Ramadan claims that the bar on "seek[ing]" to "view" "material that relates to any designated foreign terrorist organization" would bar him from accessing the website mentioned in the condition that identifies the relevant terrorist organizations. But, as the district court made clear, that would not be a "commonsense" reading of the condition. In the court's words, "no reasonable person would see that as a violation of this condition." R.342 at 11. We agree. It hardly amounts to a fair reading of the provision to say that it directs the defendant to consult a website listing the relevant terrorist organizations, then punishes him for doing so. At all events, we embrace the same clarification of the condition. It thus would not apply in this setting.

Also overstated is Ramadan's concern that the condition bars him from "access[ing] any news material." Opening Br. at 29, 32. Here, too, the district court explained that it imposed this

9

condition to prevent Ramadan from downloading material like the ISIS propaganda and bomb recipes found on his devices. Nothing in the record suggests that the district court was concerned about Ramadan learning about world events or reading about conflicts abroad.

Neither is Ramadan's condition like the overly broad one invalidated in *Zobel*. 696 F.3d at 577. That condition prohibited a defendant from possessing or viewing "sexually suggestive" materials. *Id.* We held that this provision swept too broadly, as it extended to a wide array of "mainstream literature, art, music, television programs, and movies." *Id.* And that provision had little rehabilitative purpose given that the condition also required that the defendant "not possess or view pornography of any kind." *Id.* at 575. Ramadan's provision does not restrict a swath of common literature. It instead narrowly restricts the sorts of terrorist propaganda that he had previously been accessing on his devices.

## C.

Ramadan next challenges his sentence as substantively unreasonable. But his prison sentence of two months and his term of supervised release of 34 months were not "too long." *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018). His two-month sentence fell below the Guidelines recommendation of three to nine months. Below-Guidelines sentences are presumptively reasonable. *United States v. Fields*, 763 F.3d 443, 455 (6th Cir. 2014). The district court balanced Ramadan's "intentions to try to do right" with its need to protect the public and encourage respect for the law. R.341 at 135. Given Ramadan's weapon ownership, recalcitrant re-engagement with ISIS, and his interest in creating explosives, we find nothing wrong with the court's below-Guidelines sentence. On top of that, his prior violations of the conditions of supervised release made it imperative that he face a stiff term of supervised release. Hence the need for 34 months. The district court did not abuse its discretion in "balanc[ing] the factors

differently" from how Ramadan would have wished. *United States v. Ely*, 468 F.3d 399, 404 (6th Cir. 2006) (emphasis omitted).

We affirm.

THAPAR, Circuit Judge, concurring. I join the majority's thoughtful opinion. I write separately to emphasize that the separation of powers limits our authority to address potential disparities between a defendant's conduct and his sentence.

The defendant in this case, Yousef Ramadan, received two below-Guidelines sentences. The first occurred after a federal jury convicted him of three firearms charges. For these offenses, Ramadan faced a Guidelines range of 63 to 78 months. But the district court sentenced him to time served (41 months) and two years of supervised release. Ramadan promptly violated the terms of his supervised release by purchasing a pellet gun. But nothing happened. He did it again a few years later. This time, Ramadan received a second slap on the wrist. Despite facing a Guidelines range of three to nine months, Ramadan received a two-month sentence. He also received another stretch of supervised release. Thus, Ramadan received below-Guidelines sentences each time he appeared in federal court.

One might wonder why. Ramadan has a history of troubling behavior. He has: (1) owned firearms with obliterated serial numbers; (2) kept an unregistered makeshift silencer that he used in a residential area; (3) possessed a stolen gun that disappeared from a residence where he worked; (4) built a pipe bomb; (5) tried to learn how to make chemical agents like cyanide and ricin; (6) possessed more than 1500 images of ISIS propaganda and videos of ISIS executions; (7) dressed up like an ISIS executioner; and (8) communicated with ISIS terrorists. The public might think these acts merit a serious sentence. And they might wonder why this court isn't doing anything to ensure that Ramadan's punishment fits his crimes.

However, this court doesn't have the authority to rule on the length of Ramadan's sentence. Why? The prosecutors in this case never cross-appealed his below-Guidelines sentences. And unless they do so, this court lacks the authority to consider their length. *See Greenlaw v. United*

*States*, 554 U.S. 237 (2008). So we can't consider the propriety of the sentences that Ramadan received.

This limitation reflects our system's separation of powers. The framers' decision to "partition . . . power" across multiple branches helps ensure that different parts of government "keep[] each other in their proper places." The Federalist No. 51, at 317–18 (James Madison) (Clinton Rossiter ed., 1961). The criminal context makes these divisions clear. Prosecutors are responsible for identifying defendants, charging cases, and presenting arguments. Courts, on the other hand, rule on matters of fact and law. These roles are complementary, but they aren't interchangeable. Courts can decide matters that parties bring to them. But courts can't force parties to make arguments or address claims that parties never brought. By separating the power to prosecute from the power to decide, our framers ensured that no man has the power to serve as prosecutor, judge, and jury. Instead, those roles are divided among multiple actors, preserving Madison's vision of branches that keep each other in check and thereby prevent tyranny. The Federalist No. 47, at 298 (James Madison) (Clinton Rossiter ed., 1961).

This division of labor also makes sense. As Justice Scalia explained, "[o]ur adversary system is designed around the premise that the parties know what is best . . . and are responsible for advancing the facts and arguments" at issue in a given case. *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in the judgment). This principle is particularly true of counsel for the United States, "the richest, most powerful, and best represented litigant to appear before us." *Greenlaw*, 554 U.S. at 244 (internal citation and quotation omitted). In the criminal context, prosecutors have far more knowledge about the defendant than a court does. They have been with the case for far longer than a court and are best equipped to understand and present information about it. Thus, our system tasks prosecutors with appealing sentences that

13

they consider too low. Without such an appeal, a court simply can't opine on whether a defendant's sentence is too short.

Here, the prosecutor never filed that cross-appeal. And that failure means this court can't rule on the length of Ramadan's sentence—even though his conduct is troubling. Instead, we must respect the government's decision not to cross-appeal Ramadan's sentence.